THE STATE OF OHIO, APPELLEE, *v.* LANCASTER, APPELLANT.*

*Judgment affirmed, 167 Ohio St., 391,

(No. 4716—Decided July 24, 1957.)

Mr. John S. Ballard, prosecuting attorney, and Mr. Jackson B. Morris, for appellee.

Mr. Bernard J. Roetzel and Mr. J. P. Riddle, for appellant.

Doyle, J.   Joseph F. Lancaster was indicted for murder in the first degree by a grand jury of Summit County, Ohio, and charged with "unlawfully, purposely and of deliberate and premeditated malice," killing Louise E. Wallick.

He was prosecuted upon the indictment, and a jury returned a verdict of guilty of murder in the first degree.   The verdict not having included a recommendation of mercy, the court, pursuant to judgment entered thereon, sentenced the accused to death in the electric chair.

In the appeal to this court, there are assigned the following claimed errors, which are asserted to be of a prejudicial character and constitute a denial of a fair trial:

"First:   Said court erred in overruling the motion of appellant for a new trial.

"Second:   Said court erred in its general charge to the jury on the trial of said action.

"Third:   Said court erred in refusing to give to the jury the instructions seasonably requested by appellant's counsel.

"Fourth:   Said court erred in the admission of evidence offered by the state of Ohio to the prejudice of the appellant.

"Fifth:   Misconduct by both the assistant prosecuting attorney and the prosecutor in the course of their argument to the

jury by stating facts not within the record, tending to create an unjust prejudice against the defendant: (a) in calling the attention of the jury to the failure of the appellant to offer character witnesses in his behalf; (b) in referring, over the objection of appellant's counsel, to questions and evidence which the court had ruled objectionable; and (c) in stating to the jury that the defendant had had his chance, and that he was given mercy by the Municipal Court.

"Sixth: That the verdict is not supported by sufficient evidence and is contrary to law."

The testimony of witnesses disclosed the following facts:

Mrs. Louise E. Wallick, the deceased, at the time of her death and for some time previous thereto, resided in her own home with her 13-year-old daughter, Evelyn.

The defendant resided in the same house, as a roomer and boarder, and from the direct testimony of the defendant, and inferences reasonably drawn from the witnesses for the state, the relationship between the deceased and the defendant was more than one of strictly business, having developed into an amatory and perhaps illicit connection.

Be that as it may, on October 8, 1956 (the date upon which Mrs. Wallick was shot and died), and for some time prior thereto, the deceased and the defendant quarrelled over various matters, including the objection on the part of the defendant to the association of the deceased with other men.

On the evening of the shooting, the deceased told the defendant to leave her home. He refused this request, with the suggestion that if she wanted his clothes out of the house, she should throw them out. He then telephoned a sister of Mrs. Wallick, a Mrs. Hazel Root, and the following quotation from the testimony of Mrs. Root reflects the conversation:

"Q. Would you tell the jury what the conversation was? A. Well, when the phone rang and I answered * * * it was Joe (the defendant) and he said that him and Louise were quarrelling and she had ordered him out and he said the only reason she wants me out is she wants somebody by the name of John * * *, and by that time Louise (the deceased) took the phone and she said he held a gun on me yesterday and I am afraid of him and that was all she said and all he said was 'well I am going

to help her' and that is all that was said. He said in the background when she said 'he held a gun on me,' in the background he said 'I don't even own a gun.' "

The evidence offered by the state tended to prove that, following this conversation with Mrs. Root, the deceased and her daughter retired to their bedroom and changed into their nightclothes. The defendant remained in the house. The daughter then proceeded to an adjoining bathroom; the mother followed and seated herself on the commode, and the two conversed while the daughter brushed her teeth.

At this time the defendant pushed the bathroom door open, and the daughter stepped sideways to a place between a washbasin and a clothes hamper, thereby cutting off the defendant's view of her, but leaving the mother in full view of the daughter.

The daughter's testimony, reflecting the next event, was as follows:

"Q. All right. While you were there brushing your teeth having this conversation with your mother, I want you to tell the jury what happened. A. After she told me I couldn't go [to a basketball game], I was brushing my teeth and standing in front of the washbasin, and he [the defendant] started to come in and he pushed the door and it hit me in the back and I moved to one side and my mother sat there and he came in where I could see his face and gun and biggest part of his arm and my mother just sat there she didn't say * * *.

"* * *

"Q. Evelyn, will you go on from there and tell us what else happened? A. Well, she just sat there and he came in and then he said, 'I have warned you about this for a long time,' and I just stood there, I didn't know what to do, and then I heard a click and then I heard the explosion, and my mother fell over on the side and hit the washbasin, and in order for me to get out of the bathroom he had to move first, and I ran down the steps and across the lawn and told the next[-door] neighbor."

The deceased was shot in the forehead from a distance of six to eight inches; was rendered unconscious, and died within a period of four hours.

Following the shooting, the defendant walked to his bedroom, and the daughter ran from the house to the nextdoor

neighbor, who in turn called the police. The police arrived in a few minutes. Likewise arrived Mrs. Root, the deceased's sister, to whom the defendant had talked on the telephone fifteen or twenty minutes before. Mrs. Root, obviously, in the light of her conversation with the defendant and her sister, accused the defendant of shooting her sister. The sister stated on the witness stand: "He did not make any replies or denials; he said nothing."

The foregoing recitation of facts was in substance the state's case.

The testimony of the defendant was that: he had arrived at the home from his work at about 7:30 p. m.; he had stopped enroute and drank a "double shot of whiskey"; upon his arrival he was affectionately greeted with a kiss; and he and the deceased ate supper, which she had prepared.

During and after the meal they argued over various matters, in the course of which the defendant testified that he told the deceased he would leave her home; whereupon she suggested that "if you are going to leave, why don't you go down to the Milner Hotel for the night?" He then further testified: "I said, What do you mean go down to the Milner Hotel? She said, Well, for two or three days to see how you feel, and we were bickering back and forth * * *, and I said, Well, I can leave tonight, and I got up and went up the steps, and as I started up the steps she says, Do you want me to call the Milner and see if they got a room? and I said, No, I will find one."

The defendant further testified that he then ascended the stairs to his room and laid out some of his clothes for packing; that the deceased then came into his room and put the articles of clothing, that he had placed on his bed, back into a dresser drawer; that he then walked into the bathroom, and when he came out the deceased followed him into his bedroom and said that she wanted him to talk to her sister; that a telephone conversation then ensued between the defendant and the deceased on one side, and the sister on the other (the version of this conversation given by the defendant differs substantially from that of the sister); that the deceased then proceeded into the bathroom and there joined her daughter; that the daughter shortly thereafter left the room and walked down the stairs, whereupon

the deceased called him; that he entered the bathroom, in response, saw the deceased sitting on the commode, and said to her, "What do you want?"; that he then observed a gun in her hand; that he slapped the gun out of her hand; and that, as the gun was propelled into the air, it was accidentally discharged in such a manner as to cause a bullet to penetrate the forehead of the deceased.

While there appears much evidence from which inferences may be drawn bearing upon the elements of the offense charged and the probability and improbability of the claims of the defense, it appears that the evidence which was of controlling force with the jury was the direct testimony of the daughter, in contrast to the direct testimony of the defendant.

It is obvious from the verdict that the jury gave credence to the testimony of the daughter and disbelieved the defendant. This testimony, offered by the state, buttressed by other established facts and reasonable inferences to be drawn therefrom, was sufficient to make a case of murder in the first degree.

We have examined each of the claims of error, and are of the opinion that but one claim need be discussed at length. That claim is: "Said court erred in refusing to give to the jury the instructions seasonably requested by appellant's counsel."

It appears that, at the conclusion of the court's charge to the jury, counsel for the defense requested the court to charge, in substance, "that the presence or absence of a motive is a circumstance which the jury may consider in determining the guilt or innocence of the defendant." The court did not specifically charge on the subject requested.

It is well established that motive is not an essential element of crime, and becomes important as a matter of proof—an item of evidence—only when the evidence, direct and circumstantial, fails to make out a satisfactory case. The most laudable motive is no defense when the act committed is a crime in contemplation of law. Proof of motive is never necessary to support a conclusion of guilt otherwise sufficiently established. A sufficiently established conclusion of guilt contemplates always the proof of an intention to commit the crime—a guilty mind—a *mens rea*. Such intention may be established either directly or inferentially from the facts established.

Evidence of motive in cases involving homicide, as well as in civil cases involving proof of suicide (*Hartenstein* v. *New York Life Ins. Co.*, 93 Ohio App., 413, 113 N. E. [2d], 712), is always relevant and material. The presence or absence of a motive on the part of a defendant which might lead to the commission of a murder may always be considered by the jury on the question of whether he did commit it. But whenever it is clearly established that an intentional murder has been committed, all the requisites of criminal guilt are present, even if no possible motive for the deed can be shown. In fact, even proof of a good motive will not save a defendant from conviction (a so-called mercy killing, for instance).

In certain unusual cases, motive may be a determinant of guilt or innocence of an accused. For instance, if a grave felony were about to be committed under such circumstances that the killing of the offender by a bystander, to prevent the crime, would be justified by law, and at that moment the bystander shoots the culprit, prompted by an impulse to promote the social security by preventing the felony, he is probably guilty of no offense. If, however, the bystander had no such impulse, but acted upon an urge to satisfy a personal grudge by killing a personal enemy, he has committed the crime of homicide. The intent is the same in either case—*i. e.*, to kill the person. The difference between innocence and guilt lies in the motive which prompted the intent. See 52 Harvard Law Review, 905.

However, in the case before us for decision, no such consideration need be given to the question of motive. Here the presence or absence of motive is simply an item of evidence, and may be considered by the jury in connection with other evidence in its determination of whether the crime of murder was committed.

In *Fabian* v. *State*, 97 Ohio St., 184, 119 N. E., 410, the second paragraph of the syllabus is:

"2. The proof of motive is not essential to a conviction of the crime of homicide, and where the commission of the crime by the accused is clearly established by direct evidence a judgment of conviction will not be reversed because of the following instruction: 'The law does not require the state to prove motive in this case. The presence or absence of motive shown by the

evidence may be considered by you in determining intent, or its presence or absence in the mind of the accused, so that if you find beyond a reasonable doubt that the defendant is guilty under the instructions which the court gives you, then you should find him guilty whether or not a motive has been established.' ''

That case does not impose upon the court a duty to charge on the question of motive. Nor does any statute of the state impose such a duty. The court did fully charge the jury on the issues of fact and the rules of law applicable thereto. It was not the court's duty to single out specific items of evidence, as here requested, and charge thereon, in view of the fact that this item of evidence was not essential to a conviction or acquittal and was of no particular importance, because the commission of the crime by the accused was fully established by the state's evidence.

There is not presented here any question of the identity of the accused, nor any question of the circumstances through which the deceased came to her death, if the state's witnesses were to be believed, as they obviously were. The outcome of the case hinged entirely on the credibility which the jury attached to the testimony of the various witnesses; and on this question the jury was fully charged.

The selection of a particular item of evidence in the charge of the court, thereby emphasizing its importance over other evidence in the case, could be said to be an unwarranted invasion of the province of the jury, and this is especially true in the instant case.

There is direct, positive evidence in this case, establishing every element of the crime of murder in the first degree. It was for the jury to weigh this evidence, in connection with the evidence in conflict; or, to put it another way, it was the sole province of the jury to consider the direct evidence of the defense, and all of the reasonable inferences to be drawn therefrom, and to weigh it in connection with the evidence of the state. After weighing the evidence, it was the sole province of the jury to find the facts and apply the law given by the court, and in this connection it was not the duty of the court, as stated above, to emphasize in its charge specific bits of evidence or inferences which might be drawn therefrom.

In 26 American Jurisprudence, Homicide, Section 535, will be found the following statement:

"* * * In some cases, there seems to be some doubt as to whether the apparent absence of motive may tip the scales in favor of innocence, where the evidence, otherwise considered, is in a state of balance. Such considerations, however, are perhaps too refined for a practical administration of the law, and should not be given in the charge of the jury."

The credibility of the witnesses in the case before us determined the verdict. After eliminating the obviously rejected testimony of the defendant by the jury, the remaining evidence was not in a state of balance. It all pointed to murder in the first degree, and the jury did not err in so finding.

Upon a consideration of every claim of error in the light of a minute examination of the record, this court is of the opinion that the record is devoid of error prejudicial to the rights of the appellant. The accused was given a fair trial by a thorough and competent judge, and we find nothing to keep us from applying the provisions of Section 2945.83, Revised Code. They are:

"No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court because of:

"* * *.

"(C) The admission or rejection of any evidence offered against or for the accused unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby;

"(D) A misdirection of the jury unless the accused was or may have been prejudiced thereby;

"(E) Any other cause unless it appears affirmatively from the record that the accused was prejudiced thereby or was prevented from having a fair trial."

Our attention has been called to the cases of *Felsman* v. *State*, 45 Ohio App., 428, 187 N. E., 201; and *Neiswender* v. *State*, 28 C. C. (N. S.), 545, 30 C. D., 417. The judgment of affirmance herein, in so far as we determine that a failure to charge on the subject of motive was not prejudicial, is in conflict with the pro-

nouncements in those cases. This case will therefore be certified to the Supreme Court.

Judgment affirmed, and the case certified to the Supreme Court of Ohio for review and final determination.

*Judgment affirmed.*

HUNSICKER, P. J., and STEVENS, J., concur.