[Cite as *State v. Grant*, 2023-Ohio-2720.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PAULDING COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

v.

HEIDI L. GRANT,

    DEFENDANT-APPELLANT.

CASE NO. 11-22-08

O P I N I O N

---

Appeal from Paulding County Common Pleas Court
Trial Court No. CR-22-518

Judgment Affirmed

Date of Decision:  August 7, 2023

---

APPEARANCES:

    *Brian A. Smith* for Appellant

    *Joseph R. Burkard* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Heidi L. Grant ("Grant") appeals the judgment of the Paulding County Court of Common Pleas, arguing that the trial court erred in denying her motion to suppress; that her murder conviction is against the manifest weight of the evidence; that the trial court erred in denying her requested jury instruction on self-defense; that she was denied her right to the effective assistance of counsel; and that the cumulative effects of the errors in this proceeding denied her rights to due process. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} Grant was married to Christopher Franklin ("Franklin"). On January 12, 2022, Grant went to Franklin's brother, Jeff Franklin ("Jeff"), and asked for his help in moving some possessions from their old home in Oakwood to their new home in Antwerp. Grant made Jeff aware that Franklin "had fallen off the wagon" and had returned to drinking alcohol. (Tr. 180). Concerned that "things were pretty bad" between Franklin and Grant, Jeff offered his house as a place for Grant to stay that night while the "situation * * * defuse[d] * * *." (Tr. 187).

{¶3} Grant accepted Jeff's invitation and went to his house that evening. Jeff had the cars in his garage moved to make space for Grant's car. Jeff explained that they had Grant's car put into the garage so that Franklin "wouldn't know where she was at." (Tr. 190). Jeff stated, "I didn't want no arguing" or "fighting at my house."

-2-

(Tr. 190). When Grant arrived at his house that evening, Jeff was with his wife, Elizabeth Franklin ("Elizabeth"). Both Jeff and Elizabeth later testified that Grant "was angry" at that time and asked them "when it was okay to f**king kill somebody." (Tr. 181, 197).

{¶4} Jeff stated that they talked with Grant about the situation. Grant stated that "when he [Chris] got to feeling like he was happy in life and things were going good for him, that his medications he felt that he didn't need to take them and that he could handle alcohol." (Tr. 181). Grant also stated that "[s]he was really concerned about her brother being really mad if the cops was ever called to her house because of the family business and the impact it would have on their business * * * if the police were called there." (Tr. 182). Jeff later explained that, given the small size of the town, word would have spread that the police had been at Grant's house and that could have potentially affected the family business. Grant was afraid that she potentially could lose her job over the negative attention that such an incident could draw.

{¶5} Grant then told Jeff and his wife that "she'd worked really hard in life to get what she had and she wasn't going to let another man take what she had worked for." (Tr. 183). Elizabeth testified that Grant

> [w]as clear that he [Franklin] had not been violent with her, he did not physically hurt her.
>
> * * *

She made it clear that she was not going to stand for, like anything that could harm the name of the Grants or the business. She had explained that her ex-husband and her had issues and she had been through it before and she wasn't going to have it again.

(Tr. 198). After going to bed, Grant woke up early the next morning and left the house between 5:30 A.M. and 6:30 A.M. Before her departure, she stated that "Chris was going to get help whether he liked it or not, and that she had work to do that she could do from home." (Tr. 192).

{¶6} At 7:27 A.M. on January 13, 2022, Franklin called 9-1-1. In this recorded call, the following exchange occurred:

Franklin: Get the f**k out!

Operator: Hello?

Franklin: Hello, hey, man. My wife just tried to kill me.

Operator: How'd she do that?

Franklin: F**king hit me with a fucking—I was laying on a chair and she f**king hit me across the head twice, man. Lit me up.

Operator: What she hit you with?

Franklin: A table leg.

Operator: What's your name?

Franklin: Christopher Franklin.

Operator: Where you livin' at Christopher?

Franklin: Antwerp. Across or right beside f**king Dooley House or Dooley Funeral Home. I just bought the place, man. F**k, she just come into the f**king door and I'm layin' on the chair just sleeping.

She f**king cracked me twice, man, before I could get up. Laid me out.

Operator: Okay. What's—What's her name?

Franklin: Heidi.

Operator: Are you guys married?

Franklin: Yeah.

Operator: Okay.

Franklin: I don't think she's changed her name yet, but yeah, we just got f**king married. Right after—

Operator: What was her maiden name?

Franklin: Grant. Man, I'm tore up good.

Operator: Is your address 206 West River Street?

Franklin: Yep.

Operator: Okay. Do you need a squad for yourself?

Franklin: I think I'm okay, man. I'm trying to stop the bleeding, but she f**king hit me, and I didn't even see it.

Operator: You say, she hit ya twice?

Franklin: At least.

Operator: Where's she at now?

Franklin: She just took off man.

Operator: Like took off outside, in her car?

Franklin: Yeah. In her car. She took off in her f**king car.

Operator: Okay.

Franklin: I told her she had to go, man. I f**king ran upstairs. My daughter plays softball. I grabbed her ball and like—her bat. I was like look, you got to go.

Operator: I'll get somebody over for you. Okay.

Franklin: She's gone, dude.

Operator: Well, to come down to take a report for you.

Franklin: Yeah.

Operator: Okay.

Franklin: Yeah.

(Ex. 1). At 7:28 A.M., Grant placed a call to a friend, Scott Wolf ("Wolf"), and asked to borrow a gun from him. She told Wolf that she wanted to use the gun to take a concealed carry class. Grant later testified that she "just wanted it [the gun] * * * for protection, just in case I might need it." (Tr. 390). Wolf agreed to meet Grant at the Catholic Church in Hicksville so that he could lend her a gun.

{¶7} At 7:30 A.M. on January 13, 2022, Lisa K. Davis ("Davis") was working at a Marathon gas station when Franklin arrived in his vehicle and came into Pit Stop store. She testified that he appeared "stunned" and was "beat up very badly." (Tr. 211, 212). Davis said that "[h]is right eye was swollen shut. His left eye—his right had a big old goose egg, swollen shut, blood dripping. His left eye was almost swollen shut, and just the blood dripping." (Tr. 211). Franklin indicated that he had called the police. After purchasing a pack of cigarettes, Franklin walked

outside where he waited for a short while before he got in his car and drove away. Davis testified that he was at the gas station for roughly fifteen minutes in total.

{¶8} Grant drove to Hicksville where Wolf gave her a Taurus G2C 9mm pistol. He "showed her how to take the magazine out, put it back in." (Tr. 290). He then "took the magazine out and handed her the gun."[1] (Tr. 290). He also showed Grant how to deactivate the safety. Grant later testified that she drove out of the parking lot and immediately headed to her home in Antwerp. When she arrived on her street, she drove by her house and saw a silhouette in the bathroom window that she believed to be Franklin. She then decided to enter her house with the gun in her right pocket.

{¶9} When she entered the residence, she saw Franklin standing by the stairs. Grant testified that Franklin was holding a bat and was walking towards her. She then testified that "he came at me and he went to swing, so I went like this (indicating) and when I went like that, the gun—I shouldn't have had my finger on the trigger, but it went off." (Tr. 396). Grant stated that she fired the gun until Franklin dropped to the ground. She later recounted Franklin "saying something like what the f**k, you're killing me" as she was shooting him. (Tr. 439). After shooting Franklin nine times, Grant then walked over to him while he was lying on the ground and fired a tenth shot into his body. She later testified that she believed

---

[1] Wolf testified that he removed the clip to show Grant how the gun worked. He later testified that he was not entirely certain as to whether he put the clip back into the gun before she left the parking lot.

that Franklin was dying at this point and affirmed that she fired this final shot "so that he would die[.]" (Tr. 432). Grant explained that she did this because she "didn't want him to hurt" and wanted "to save him one more second of pain * * *." (Tr. 397, 432).

{¶10} Within several minutes of the shooting, Grant heard a knock on her door. Outside was Chief George R. Clemens ("Chief Clemens") of the Antwerp Police Department. Dispatch had informed him at 7:35 A.M. that Franklin had reported a domestic incident; that Grant had left the premises; but that Franklin wanted to make a report. He guessed that he "probably" arrived at Grant's house around 8:00 to 8:05 A.M. (Tr. 246-247). Grant opened the door, stepped onto the front porch, and closed the door behind her. Chief Clemens later described Grant as appearing "[c]alm, cool, and collected" during ther interaction. (Tr. 228). He also stated that she did not appear to have any injuries.

{¶11} Chief Clemens then explained to Grant that he had come to discuss the 9-1-1 call that Franklin had placed earlier that morning. Grant told Chief Clemens that "there was no domestic violence" and that "she hadn't hit him [Franklin] * * *." (Tr. 228). She also stated that "she didn't know why he would have called other than he was drunk and he was now passed out." (Tr. 228). When Chief Clemens asked to go in the home to speak to Franklin, Grant told him "I'd rather we not, I don't want to bother him. But I'll tell you what, when he gets up if he still wants to talk to you, I'll have him give you a call." (Tr. 248).

**{¶12}** When asked at trial why she did not tell Chief Clemens about the incident, Grant gave the following explanation:

> The only thing that was going through my mind at that moment is I can't be arrested. Like, no, no, no, no. So many people were counting on me. I didn't want his family to hurt. I didn't want—I didn't want everybody that I love to be affected this way.

(Tr. 401). She stated, "I felt like it was too late and—I kn[e]w I had to pick his [Franklin's] daughter up from school that day." (Tr. 401-402). After Chief Clemens left, Grant then "gathered herself" and made "the decision to just try to clean everything up and try to take care of it without asking for help." (Tr. 403).

**{¶13}** Grant used an area rug to drag Franklin's body into the basement where she wrapped him up in plastic and hid the gun on a shelf in the basement. She then went to Menards on January 13, 2022 and rented a rug doctor at 10:58 A.M. She returned to Menards on January 14, 2022 to purchase "three bags of concrete, gloves, mixer, duct tape and [a] finishing trowel" and on January 15, 2022 to purchase concrete blocks. Grant used the supplies she had purchased at Menards to build a concrete vault around Franklin's body in her basement. Grant also cut the carpet out of the room in which she had shot Franklin and disposed of it in a dumpster located outside of where she worked.

**{¶14}** On January 21, 2022, Officer Damien Esparza ("Officer Esparza") of the Antwerp Police Department was dispatched to Grant's house after Franklin's brother filed a missing person report for Franklin. Officer Esparza then

communicated with Grant about Franklin's whereabouts and took a written statement from her. Grant reported that, on the previous Sunday, she and Franklin were at their house; that she left to take Franklin's daughter to a softball game; that Franklin was going to their old house to retrieve some items; and that, when she returned after roughly three hours, Franklin was gone. She stated that she had not seen him since that Sunday.

{¶15} Grant further reported that she had located Franklin's vehicle next to their reception hall; that his keys were on the ground next to the vehicle; that she had driven his vehicle home; that she located his cell phone under their bed and had, for this reason, been unable to contact him. Officer Esparza stated that, during this interaction, Grant "appeared calm and cooperative." (Tr. 221). He then reported this information to Chief Clemens.

{¶16} Because the police were not making any progress in locating Franklin, Chief Clemens contacted Grant on January 22, 2022 and asked her to come to the police department to provide whatever information she might have about where Franklin might be. Grant agreed to sit for an interview and went to the police station. In her interview with Chief Clemens, Grant initially "answer[ed] his questions" by giving the "same" answers she had given to Officer Esparza. However, roughly fifty minutes into the interview, Chief Clemens came to believe that Grant was not being forthcoming.

{¶17} Chief Clemens then told Grant that several of her statements contradicted several facts that the missing person investigation had established. He then asked her to tell him what had actually transpired and where Franklin was. Shortly thereafter, Grant told the police that she had shot Franklin and hidden his body in her basement. At trial, she explained that she gave this information to the police because she "realized that * * * [she] just needed to come clean with it and just let them know" what had happened. (Tr. 438). She also stated that she "was tired of trying to cover it up" and affirmed that she "didn't want to lie any more[.]" (Tr. 405). Grant also affirmed that she "felt better when [she] * * * told the police" and "had the chance to confess to law enforcement[.]" (Tr. 405).

{¶18} Grant then began to cooperate with the police. Officer Victoria Clemens ("Officer Clemens") then provided Grant with a written copy of the *Miranda* warnings and read these rights to Grant out loud. After signing this copy of the *Miranda* warnings, Grant made a written statement about what had transpired on January 13, 2022 that reads as follows:

> The week of the 13th, Chris Franklin, my husband, had started drinking again, after a year of sobriety. On the 13th, I came home to check on him. He didn't know who I was and started yelling at me, as though I was an intruder. He picked up his daughter's bat and started swinging it at me. I left the house and was panicking. I called Scott Wolf and told him I wanted to take a concealed carry class so I could have protection. Scott did not know the current situation. I met him to borrow his gun. I thought the safety was on. I went back home to try to talk to Chris and calm him down. I knew he needed help. When I came into the home, he still had the bat and came at me again, swinging it at me. I pulled the gun out, hoping to scare him—just

> scare him—away from me. The gun—I thought the safety was on—
> I accidentally fired it at him and he went down. I didn't want him to
> suffer, so I shot him again. I don't know how many times. I
> completely freaked out! I didn't know what to do!!! I wrapped him
> in plastic and got him down to the basement. The following 2 days, I
> put cinder blocks around him and covered him with cement. I wasn't
> trying to hurt anybody. I am so sorry for this. He was going to kill
> me and I just didn't know what to do. I completely panicked. For
> everyone that I've let down, I am sorry. Please forgive me.

(Ex. 3). She then drew a floorplan of her house that detailed where she and Franklin had been standing at the time of the shooting. She also drew a diagram of the basement to show where Franklin's body and the gun were located. Law enforcement then went to Grant's house and recovered Franklin's body from the basement. They also found the gun in the location described by Grant.

{¶19} On January 25, 2022, an autopsy was conducted on Franklin's remains. The coroner concluded that Franklin had suffered ten gunshot wounds to his body. The coroner was able to recover six bullets from Franklin's body. The coroner also determined that Franklin had several blunt-force injuries to his had that were incurred while he was still alive. These injuries included a laceration on his chin and what could possibly be a defensive wound on his hand. The toxicology report indicated that Franklin had a blood alcohol level of 0.07.

{¶20} On February 11, 2022, Grant was indicted on one count of aggravated murder in violation of R.C. 2903.01(A), an unclassified felony; one count of murder in violation of R.C. 2903.02(A), an unclassified felony; and one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree. The

charges of aggravated murder and murder each carried a firearm specification pursuant to R.C. 2941.141(A). On May 25, 2022, Grant filed a motion to suppress the written statement and diagrams that she gave to the police on January 22, 2022. However, trial court denied Grant's motion to suppress as to the written statement and diagrams.

**{¶21}** A jury trial was held on the charges against Grant from October 18 to 20, 2022. At trial, Grant testified in her own defense. The Defense requested jury instructions for voluntary manslaughter. The trial court included an instruction for voluntary manslaughter over the objections of the State. The Defense also requested a jury instruction for self-defense, but the trial court declined to include such an instruction. On October 20, 2022, the jurors returned verdicts of guilty on the count of tampering with evidence, the count of murder, and one firearm specification. The jurors returned verdicts of not guilty on the count of aggravated murder and the associated firearm specification. On November 30, 2020, the trial court issued its judgment entry of sentencing.

**{¶22}** Grant filed her notice of appeal on December 16, 2022. On appeal, she raises the following six assignments of error:

**First Assignment of Error**

**Because the trial court incorrectly applied the legal standard in Appellant's case, the trial court erred in denying Appellant's Motion to Suppress with respect to State's Exhibit 3, Appellant's handwritten statement and diagrams, and any oral statements made following the point marked by 0:01:13 of the body camera**

video entitled 'heidi 2126 confession,' in violation of Appellant's right against self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

**Second Assignment of Error**

Because the jury lost its way and created a manifest miscarriage of justice in convicting Appellant, Appellant's conviction for Murder, and the attached firearm specification, was against the manifest weight of the evidence.

**Third Assignment of Error**

Because the evidence established that Appellant acted in self-defense, the trial court committed plain error in denying Appellant's request for a jury instruction on self-defense against the danger of death or great bodily harm.

**Fourth Assignment of Error**

Because the performance of Appellant's trial counsel fell below an objective standard of reasonable representation and prejudiced Appellant, the failure of Appellant's trial counsel to object to the trial court's decision denying Appellant's request for a jury instruction on self-defense against the danger of death or great bodily harm constituted ineffective assistance of counsel, in violation of Appellant's right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

**Fifth Assignment of Error**

Because the performance of Appellant's trial counsel fell below an objective standard of reasonable representation and prejudiced Appellant, the failure of Appellant's trial counsel to object to State's Exhibit 1, the audio of the 911 call made by the alleged victim, and to testimony regarding an unrelated alleged domestic violence incident from the morning of the incident between Appellant and the alleged victim, constituted ineffective assistance of counsel, in violation of Appellant's right to counsel

**under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.**

**Sixth Assignment of Error**

**The cumulative errors of Appellant's trial counsel fell below an objective standard of reasonable representation and prejudiced Appellant, in violation of Appellant's right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution, and deprived Appellant of a fair trial, in violation of Appellant's right to Due Process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution.**

After considering Grant's first assignment of error, we will examine her fifth and third assignments of error before concluding with her second, fourth, and sixth assignments of error.

*First Assignment of Error*

{¶23} Grant argues that the trial court erred by denying her motion to suppress the statements that she had made to the police on January 22, 2022.

Legal Standard

{¶24} On appeal, "motions to suppress present 'mixed questions of law and fact.'" *State v. Kerr*, 3d Dist. Allen No. 1-17-01, 2017-Ohio-8516, ¶ 18, quoting *State v. Yeaples*, 180 Ohio App.3d 720, 2009-Ohio-184, 907 N.E.2d 333, ¶ 20 (3d Dist.).

> At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. [*State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8]. *See also State v. Carter*, 72

Ohio St.3d 545, 552[, 1995-Ohio-104, 651 N.E.2d 965] (1995). When reviewing a ruling on a motion to suppress, deference is given to the trial court's findings of fact so long as they are supported by competent, credible evidence. *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19[, 437 N.E.2d 583] (1982).

*State v. Harpel*, 3d Dist. Hardin No. 6-20-03, 2020-Ohio-4513, ¶ 16, quoting *State v. Sidney*, 3d Dist. Allen No. 1-19-32, 2019-Ohio-5169, ¶ 8. "Accepting [the trial court's findings of] fact[] as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *State v. James*, 2016-Ohio-7262, 71 N.E.3d 1257, ¶ 8 (3d Dist.), quoting *Burnside* at, ¶ 8.

**{¶25}** A defendant may file a motion to suppress statements obtained by law enforcement in violation of the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and its progeny. "*Miranda* requires that a person subject to custodial interrogation be advised in clear and unequivocal language of certain rights * * *." *State v. Coleman*, 2018-Ohio-4043, 121 N.E.3d 91 (2d Dist.). *Miranda* warnings inform a defendant

[1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*State v. Smith*, 2018-Ohio-1444, 110 N.E.3d 944, ¶ 16 (3d Dist.), quoting *Miranda*, *supra*, at 478. "Police do not have to provide additional warnings to a suspect beyond what *Miranda* requires." *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-

7006, 823 N.E.3d 836, ¶ 69. *Miranda* warnings are intended to protect "a defendant's privilege against self-incrimination and his right to counsel." *State v. Holt*, 132 Ohio App.3d 601, 605, 725 N.E.2d 1155, 1158 (1st Dist. 1997).

**{¶26}** "Only *custodial* interrogation triggers the need for *Miranda* warnings." (Emphasis sic.) *State v. Biros*, 78 Ohio St.3d 426, 440, 1997-Ohio-204, 678 N.E.2d 891, 904 (1997). Thus, "[p]olice are not required to administer *Miranda* warnings to everyone whom they question." *Id*. "A custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, ¶ 9, quoting *Miranda* at 444.

> In order to determine whether a person is in custody for purposes of receiving *Miranda* warnings, courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave. *Thompson v. Keohane* (1995), 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383. Once the factual circumstances surrounding the interrogation are reconstructed, the court must apply an objective test to resolve 'the ultimate inquiry' of whether there was a "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler* (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275, quoting *Oregon v. Mathiason*, 429 U.S. at 495, 97 S.Ct. 711, 50 L.Ed.2d 714.

*State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 27. Courts have considered the following circumstances in making this determination:

(1) the location of the interrogation, i.e., whether the defendant was comfortable and in a place a person would normally feel free to leave; (2) whether the defendant was a suspect at the time the interrogation began; (3) whether the defendant's freedom to leave was restricted in any way; (4) whether the defendant was handcuffed or informed he or she was under arrest; (5) whether the defendant was threatened during the interrogation; (6) whether the defendant was physically intimidated during the interrogation; (7) whether the police verbally dominated the interrogation; (8) the defendant's purpose for being at the place where the interrogation occurred; (9) whether neutral parties were present at any point during the interrogation; and (10) whether the police took any action to overpower, trick, or coerce the defendant into making a statement.

*State v. Nichols*, 10th Dist. Franklin No. 19AP-612, 2020-Ohio-5157, ¶ 39. *State v. Montgomery*, 1st Dist. Hamilton No. C-220063, 2022-Ohio-4030, ¶ 21; *State v. Ward*, 2023-Ohio-328, 208 N.E.3d 143, ¶ 25 (2d Dist.); *State v. Carter*, 3d Dist. Allen No. 1-10-01, 2010-Ohio-5189, ¶ 23.

**{¶27}** The determination as to "whether a suspect is in custody is a mixed question of fact and law entitled to independent review." *State v. Reindel*, 2017-Ohio-28, 80 N.E.3d 1098, ¶ 17 (2d Dist.), quoting *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, ¶ 48. For this reason, an appellate court is to "defer to the [trial] court's findings of fact, when articulated, but evaluate de novo whether on those facts, [the defendant] was in custody." *State v. Meadows*, 2022-Ohio-287, 184 N.E.3d 168, ¶ 31 (4th Dist.), quoting *State v. Dukes*, 4th Dist. Scioto Nos. 16CA3745 and 16CA3760, 2017-Ohio-7204, ¶ 45.

**{¶28}** If the requirements of *Miranda* are violated, the United States Supreme Court has held that the unwarned statements must be suppressed and may

not be admitted at trial as evidence of guilt. *Oles, supra,* at ¶ 9, citing *Miranda, supra,* at 479. *See State v. Patane*, 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004). However, the Ohio Constitution provides more protection than the United States Constitution and additionally requires the suppression of evidence that was obtained as "the direct result" of unwarned statements that were made during a custodial interrogation. *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 895, ¶ 49.

## Legal Analysis

{¶29} In this case, Franklin's brother filed a missing person report. As a result, the police opened a missing person investigation into Franklin's disappearance. At around 8:30 P.M. on January 22, 2022, Chief Clemens contacted Grant and asked her to come to the police station for an interview to see if she had any additional information that could assist the police in locating Franklin. Grant agreed to come and arrived at the police station by 8:36 P.M. A video recording of this interview was admitted into evidence at the suppression hearing in this case.

{¶30} To evaluate the trial court's decision on the motion to suppress, there are roughly five phases of this interview that must be examined. First, from roughly 8:36 P.M. to 9:27 P.M., Chief Clemens and Grant worked together to establish a timeline of where Franklin had been over the previous two weeks. The tone of this portion of the interview was cooperative and casual. Second, at roughly 9:27 P.M., Chief Clemens told Grant that his investigation provided him with information that

could demonstrate that some of what she was saying about Franklin's disappearance was false. The tone of the questioning became more pointed as Chief Clemens began pressing Grant to tell him what had really transpired. A couple minutes later, Grant looked down at her phone while Chief Clemens was speaking with her. In response, Chief Clemens slid the phone away from her to the other side of the desk.

**{¶31}** Third, at around 9:47 P.M., Grant began to specifically describe what had transpired on January 13, 2022. At this time, the questioning became less pointed and took on a more reassuring tone. Grant explained what had transpired for roughly fourteen minutes. Fourth, at roughly 10:01 P.M., Chief Clemens left the room, and Officer Clemens performed a pat down of Grant's person. Officer Clemens then took away Grant's keys and another phone that she had in her pocket. The police then asked a number of questions to Grant. Fifth, at around 10:19 P.M., Officer Clemens Mirandized Grant. Officer Clemens then asked Grant if she was willing to make a written statement about what had transpired. Grant then wrote a statement. Over the course of subsequent questioning, Grant then drew two diagrams to explain where the shooting took place in her house and where Franklin's body was located in the basement.

**{¶32}** After the suppression hearing, the trial court issued a decision in which it concluded that the custodial interrogation began during the second phase of the interview when Chief Clemens slid Grant's phone away from her and towards the other side of his desk. For this reason, the trial court ordered that the verbal

statements made in the second, third, and fourth phases of this interview in between roughly 9:27 P.M. and 10:19 P.M. be suppressed. However, the trial court then concluded that the written statements Grant gave in the fifth phase of this interview after she had been Mirandized were admissible.

{¶33} On appeal, Grant argues that the oral and written statements that she made after 9:27 P.M. in the second, third, fourth, and fifth phases of the interview should have been be suppressed. The factual circumstances surrounding this interview are not in dispute and are contained in a video recording. Rather, resolution of this challenge turns on the legal significance of Chief Clemens's act of sliding Grant's phone away from her. *Meadows, supra*, at ¶ 31. For this reason, we turn to examining the trial court's legal conclusion as to when Grant entered police custody.

{¶34} The beginning of the recording shows Chief Clemens calling Grant at roughly 8:30 P.M. and asking her if she was willing to come to the police station for an interview. He later testified that their efforts to locate Franklin in the missing person investigation kept "running into dead ends" and that he "reached out to her to get some more facts, more information, on where he might be, or who he might be with." (Suppression Hearing Tr. 26). The beginning of the recording makes clear that Grant voluntarily agreed to the interview over the phone and then came to the police station on her own. *State v. Wilson*, 2d Dist. Montgomery No. 22665, 2009-Ohio-1279, ¶ 17, 31. She was not transported to the police station by law

enforcement and was not in handcuffs at any time on the video recording. *State v. Lennox*, 11th Dist. Lake No. 2010-L-104, 2011-Ohio-5103, ¶ 45.

**{¶35}** At the police station, Chief Clemens and Officer Clemens walked with Grant back to his office where they sat down. *Lennox* at ¶ 50 (considering the fact that the defendant was interviewed in a conference room rather than "an interrogation room or cell"). In the video, neither officer appears to be wearing any kind of police uniform but appeared to be in plain clothes. *State v. Lerch*, 9th Dist. Summit No. 26684, 2013-Ohio-5305, ¶ 16 (considering the fact that the interviewer "was dressed in plain clothes"). One of the officers shut the door behind them, but there is no indication that the door was locked as the police walked in and out of Chief Clemens's office several times later in the interview. *State v. Woodward*, 3d Dist. Hancock No. 5-18-21, 2019-Ohio-908, ¶ 23 (considering whether the door to the interview room was locked); *State v. Cochran*, 5th Dist. Coshocton No. 03-CA-01, 2003-Ohio-6863, ¶ 18 (considering the fact that there was "no evidence that the door to the office could not be opened from the inside without a key").

**{¶36}** At the suppression hearing, Chief Clemens testified that Grant was not a suspect at the time that he invited her to the police station. *State v. Jordan*, 2d Dist. Greene No. 2004 CA 115, 2005-Ohio-4202, ¶ 39 (holding that "an officer's subjective intent" is not determinative while still considering the testimony of an officer as to whether the defendant was a suspect). The content of the interview is consistent with this testimony as Grant worked with Chief Clemens to develop a

timeline of where Franklin had been and to list the places that she had looked for him for the first fifty minutes of the interview. *State v. Greeno*, 3d Dist. Seneca No. 13-02-46, 2003-Ohio-3687, ¶ 18 (considering "[t]he substance of the interview" in determining whether the defendant was "considered a suspect at the time the interview began"). The tone of the conversation was cooperative and casual during this first phase of the interview as Grant worked with the police to reconstruct a timeline of Franklin's whereabouts and behavior over the previous two weeks.

{¶37} However, at roughly 9:27 P.M., Chief Clemens noted that several of Grant's statements in the initial phase of the interview were inconsistent with what his investigation had uncovered. In this second phase of the interview, Chief Clemens shifted to asking pointed questions about what had really happened to Franklin. At the suppression hearing, Chief Clemens testified that this shift occurred because several of Grant's responses during the initial portion of the interview made him think that she was not being entirely forthcoming. At this time, Grant's phone was sitting on the desk in front of her and was not in her hands.

{¶38} At roughly 9:29 P.M., Grant began looking down at her phone and tapping the screen while Chief Clemens was asking her questions. In response, he reached for her phone and slid it across the desk. *See State v. Luke*, 3d Dist. Allen No. 1-06-103, 2007-Ohio-5906, ¶ 12 (considering the fact that the defendant had access to "his cell phone during and after the interview" as a circumstance weighing against characterizing a police encounter as a custodial interrogation). Having

viewed the video recording of this interview in its entirety, we cannot agree with the trial court's conclusion that the act of sliding Grant's phone across the desk transformed this interaction into a custodial interrogation for several reasons.

{¶39} First, the phone was sitting on the desk in front of Grant. The phone was not removed as part of a search of her person. The phone was not removed from the room and remained on the desk for the duration of the interview. Grant also had a second phone in her pocket that was not taken from her possession. Second, after Chief Clemens reached for the phone, he stated, "This is one of the things here that I'm going to have to take and get a search warrant for. But listen, that's in addition to everything else." (Ex. 1). In response, Grant expressly gave consent for him to examine the contents of the phone, saying "You can look at anything on there." (Ex. 1). Given the context of this statement, Grant's response suggests that she was willing to continue to cooperate with law enforcement voluntarily.

{¶40} Third, shortly thereafter, Grant also stated, "If you want to arrest me, arrest me. I didn't do it." (Ex. 1). Chief Clemens responded by saying, "I don't want to arrest you." (Ex. 1). Again, these statements indicate that Grant did not subjectively believe that she was under arrest or was not free to leave. Given the surrounding circumstances, we cannot conclude that, at this moment, a reasonable person in Grant's situation would have thought otherwise. Fourth, we also note that, after she admitted to obtaining a gun from her friend and to then shooting Franklin,

Chief Clemens stated, "Can I ask you where the gun is that you used? It's not in your pockets or anything is it?" (Ex. 1). The fact that Chief Clemens thought that a gun could conceivably have been in Grant's pockets at that point indicates that she had not been searched and does not suggest that the police had arrested her or already taken her into custody by this point.

{¶41} Finally, the only change in circumstance that accompanied the phone being slid away from Grant's side of the desk was the shift in the tone of the questioning that had occurred several minutes previously. Chief Clemens's asked a number of pointed questions and pressed Grant to tell the truth. We note that, during this timeframe, Chief Clemens appealed to God, family ties, and her sense of right and wrong as reasons for Grant to be forthcoming, but he did not make any threats. He even offered to leave the room if Grant felt more comfortable speaking alone with Officer Clemens. While Chief Clemens was in fairly close proximity to Grant, his office was a relatively small room and a desk was partially positioned in between them. His posture towards Grant did not otherwise change in this second phase.

{¶42} Grant was understandably emotional during this phase of the interview. About eight minutes into the more pointed questioning, Grant told Chief Clemens to "please stop saying" that he thought she knew what happened to Franklin and said she knew that he was "trying to break" her. (Ex. 1). Within about ten minutes of the pointed questioning, Grant said, "I'm not a bad person" and

"everyone is going to think I'm a monster." (Ex. 1). She then stated that Franklin's family is "going to hate me" and that Franklin's "ex-wife wished him dead many a time." (Ex. 1). While Chief Clemens did verbally dominate the questioning for a segment of roughly fifteen-minutes, the prior shift in tone in conjunction with the later act of moving one of Grant's phones did not render this interview custodial in nature. No other circumstances accompanying this phone being moved across the desk suggests that this act transformed this police encounter into a custodial interrogation such that a reasonable person in Grant's position would no longer have felt free to leave. As the trial court incorrectly concluded that Grant entered custody at this moment, we will proceed to examining the next phases of this interview.

{¶43} At 9:47 P.M., the third phase of this interview began when Grant began specifically describing what had happened on January 13, 2022. At this point, the questioning was not pointed and took on a reassuring tone. For roughly fifteen minutes, Grant gave the details surrounding Franklin's death. She maintained that she acted to defend herself, concluding this initial explanation by stating, "I'm not a murderer." (Ex. 1). At this point, she indicated that she was afraid of going to jail but still appeared to hold out hope that she might be seen as having acted in self-defense. The officers also asked Grant if she wanted any water to drink during this portion of the interview. At the end of this phase, Chief Clemens left the room, and Officer Clemens began speaking with her.

{¶44} At 10:01 P.M., the fourth phase of the interview began when Officer Clemens asked Grant to stand up so that she could perform a pat down of her person. Officer Clemens then removed Grant's keys and another phone from her pockets and took them away from her. Chief Clemens then came into the room to take Grant's keys so that the police could search Grant's house. A few minutes later, Grant said, "I'm not allowed to look at my phone, am I." (Ex. 1). Officer Clemens stated, "I'm afraid not." (Ex. 1). Based on these remarks and the surrounding circumstances, we conclude that Grant entered police custody when Officer Clemens performed the pat down at 10:01 P.M. and that a reasonable person in Grant's position would no longer feel free to leave at this juncture.

{¶45} The fifth phase of this interview began when Officer Clemens Mirandized Grant at 10:19 P.M. She was then asked to give a written statement and spent about fifteen minutes writing out her account of what had happened. Officer Clemens then asked a number of questions based on the written statement. This questioning was casual with Officer Clemens assuming a very sympathetic tone. Grant was extremely cooperative and drew two diagrams to assist the police with their investigation. These diagrams showed where the shooting took place and where Franklin's body was located in the basement.

{¶46} In its decision on the motion to suppress, the trial court held that the statements Grant gave in the first and fifth phases of the interview were admissible but that any statements given in the second, third, and fourth phases of the interview

in between roughly 9:27 P.M. and 10:19 P.M. were inadmissible. Thus, the verbal confession in the third phase of the interview was suppressed but the written statement given in the fifth phase was not. In the text of her assignment of error, Grant argues that the trial court erred by failing to suppress all of the statements that she gave after the first phase of the interview concluded at 9:27 P.M. Thus, Grant is primarily challenging the decision not to suppress her written statement.

**{¶47}** However, the trial court incorrectly concluded that Grant entered police custody at roughly 9:27 P.M.[2] Rather, the video indicates that Grant was not in police custody until 10:01 P.M. For this reason, we conclude that Grant's blanket assertion—that all the verbal and written statements that she gave to the police after 9:27 P.M. should be suppressed—is incorrect because she was not in police custody when she gave the verbal statements that explained what had happened to Franklin on January 13, 2022.

**{¶48}** On appeal, Grant also challenges the voluntariness of her decision to waive her *Miranda* rights before she agreed to give a written statement to the police. In the video, the police gave Grant a copy of the *Miranda* warnings so that she could

---

[2] In a "question first and warn later" strategy, law enforcement does not Mirandize the defendant before a custodial interrogation; secures a confession; gives the *Miranda* warnings; and then asks the defendant to repeat the confession. *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). Thus, the trial court essentially concluded that the police used such a tactic herein by concluding that the police secured a verbal confession in the second and third phases of the interview during a custodial interrogation and then, after Mirandizing Grant for the first time, had her write down her confession in the fifth phase. However, the circumstances of this interview, as portrayed by this video recording, do not suggest that the police employed a custodial question first tactic in this situation. The Ohio Supreme Court has held that a custodial question first tactic is not permissible. *Farris, supra*, at ¶ 4, 16, 29, 49. *See State v. Benson*, 11th Dist. Ashtabula No. 2018-A-0054, 2019-Ohio-3234, ¶ 55.

follow along while these statements were read out loud by Officer Clemens. Grant

was asked if she had any questions and indicated that she did not. She then signed

the waiver.

> In the context of *Miranda*, the United States Supreme Court has explained the two aspects of waiver. 'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."

*State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, ¶ 7, quoting

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986),

quoting *Fare v. Michael C*., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d

197 (1979). In deciding whether a defendant's waiver of his or her *Miranda* rights

was voluntary, courts consider a variety of factors:

> 'including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.' *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus[, *overruled on other grounds in Edwards v. Ohio*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978)]. A waiver will not be deemed to be involuntary 'unless there is evidence of police coercion, such as physical abuse, threats, or deprivation of food, medical treatment, or sleep.' (Emphasis sic.) *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 35.

*State v. Garrett*, --- Ohio St.3d ---, 2022-Ohio-4218, ---N.E.3d ---, ¶ 101.

{¶49} Having examined the video recording of the interview in its entirety, we find no indication that Grant's waiver of her *Miranda* rights was not voluntary. Grant was a forty-eight year old woman. She had been at the police station for roughly one hour and forty-five minutes at the time she was Mirandized. Only about fifteen minutes of this time involved pointed questioning. While the police were persistent in their questioning for these fifteen minutes of pointed questioning, no threats were made. At trial, Grant explained her decision to be forthcoming by saying she "realized that * * * [she] just needed to come clean" and affirmed that she "didn't want to lie any more[.]" (Tr. 405). She also affirmed that she "felt better" after she decided to tell the police what had transpired. (Tr. 405).

{¶50} Further, she was aware of why she was at the police station from the outset. She communicated cogently with the officers, indicating an understanding of the questions and of the situation. The video also gives no indication that her faculties were impaired in any manner by intoxication or otherwise. Finally, there is absolutely no evidence of any "physical abuse, threats, or deprivation of food, medical treatment, or sleep." *Wesson* at ¶ 35. Against these factors, Grant has not directed our attention to any fact or circumstance that would lead to the conclusion that her confession was involuntary.

{¶51} However, even if an error had occurred in the process of giving the *Miranda* warnings after Grant entered police custody at 10:01 P.M., the statement Grant gave thereafter simply reduced the substance of her previous, verbal

statements into writing.  Additionally, we can find no physical evidence introduced at trial that was obtained solely on the basis of the statements that Grant made after she was in police custody.  Since we have already concluded that the verbal statements that Grant made before she was in custody at 10:01 were not given in violation of *Miranda*, any error in introducing the written statement at trial was harmless.  *State v. Kalna*, 7th Dist. Mahoning No. 18 MA 0133, 2020-Ohio-5016, ¶ 39 (applying a harmless error standard to an alleged *Miranda* violation); *State v. Scullin*, 8th Dist. Cuyahoga No. 107866, 2019-Ohio-3186, ¶ 35; *State v. Wilson*, 12th Dist. Butler No. CA2019-08-141, 2020-Ohio-3227, ¶ 35.

{¶52} In conclusion, Grant was not in police custody until 10:01 P.M. Accordingly, Grant's assertion that all of the statements that she gave after 9:27 P.M. should have been suppressed is without merit.  Further, having reviewed the recording of the police interview in its entirety, there is no indication that Grant's *Miranda* waiver was involuntarily made.  Finally, the written statement that is challenged on appeal simply reduced the substance of Grant's prior, admissible, verbal statements into writing.  Thus, even if the admission of this written statement at trial had been error, such error would have been harmless.  For these reasons, Grant's first assignment of error is overruled.

*Fifth Assignment of Error*

{¶53} Grant argues that her trial counsel was ineffective for failing to object to the introduction of the evidence about the incident that prompted Franklin to call

9-1-1 on the morning of the shooting. Grant asserts that evidence about this incident was inadmissible under Evid.R. 404(B).

Legal Standard

**{¶54}** "Under Ohio law, 'a properly licensed attorney is presumed to carry out his duties in a competent manner.'" *State v. Gee*, 3d Dist. Putnam No. 12-92-9, 1993 WL 270995 (July 22, 1993). "For this reason, the appellant has the burden of proving that he or she was denied the right to the effective assistance of counsel." *State v. Cartlidge*, 3d Dist. Seneca No. 13-19-44, 2020-Ohio-3615, ¶ 39. "In order to prove an ineffective assistance of counsel claim, the appellant must carry the burden of establishing (1) that his or her counsel's performance was deficient and (2) that this deficient performance prejudiced the defendant." *State v. McWay*, 3d Dist. Allen No. 1-17-42, 2018-Ohio-3618, ¶ 24, quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶55}** In order to establish deficient performance, the appellant must demonstrate that trial "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *State v. Howton*, 3d Dist. Allen No. 1-16-35, 2017-Ohio-4349, ¶ 35, quoting *Strickland* at 687, 104 S.Ct. 2052. "[D]ebatable trial tactics do not establish ineffective assistance of counsel." *State v. Queen*, 3d Dist. Logan No. 8-19-41, 2020-Ohio-618, ¶ 14, quoting *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101.

'Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance.' *State v. Harrison*, 2015-Ohio-1419, 31 N.E.3d 220, ¶ 75 (3d Dist.). '[T]rial counsel's failure to object is generally viewed as trial strategy and does not establish ineffective assistance.' *State v. Turks*, 3d Dist. Allen No. 1-08-44, 2009-Ohio-1837, ¶ 43.

*State v. Harvey*, 3d Dist. Marion No. 9-19-34, 2020-Ohio-329, ¶ 58. A trial attorney is not required to "raise meritless issues or even all arguably meritorious issues." *State v. Mayse*, 88 N.E.3d 1208, 2017-Ohio-1483, ¶ 24 (3d Dist.).

**{¶56}** "In order to establish prejudice, 'the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.'" *State v. Berry*, 3d Dist. Union No. 14-20-05, 2021-Ohio-1132, ¶ 122, quoting *State v. Bibbs*, 2016-Ohio-8396, 78 N.E.3d 343, ¶ 13 (3d Dist.). "If the appellant does not establish one of these two prongs, the appellate court does not need to consider the facts of the case under the other prong of the test." *State v. Gear*, 3d Dist. Van Wert No. 15-22-03, 2023-Ohio-1246, ¶ 50.

**{¶57}** Further, under Evid.R. 404(B)(1), "[e]vidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Evid.R. 404(B)(1). While other acts evidence may not be used to establish a person's propensity to engage in certain conduct, "'[o]ther acts' evidence may be properly admitted as 'inextricably intertwined' with an offense" or for one of the "legitimate

purpose[s]" set forth in Evid.R. 404(B)(2). *State v. Hill*, 5th Dist. Stark No.

2018CA00077, 2019-Ohio-3432, ¶ 49.

> Evid.R. 404(B) only applies to limit the admission of so-called 'other acts' evidence that is 'extrinsic' to the crime charged. *State v. Stallworth*, 11th Dist. Lake No. 2013-L-122, 2014-Ohio-4297, ¶ 37. In other words, 'Evid.R. 404(B) does not apply when the acts are intrinsic as opposed to extrinsic, i.e., the acts are part of the events in question or form part of the immediate background of the alleged act which forms the basis for the crime charged.' *State v. Wainscott*, 12th Dist. Clermont No. CA2015-07-056, 2016-Ohio-1153, ¶ 19, citing *State v. Crew*, 2d Dist. Clark No. 2009 CA 45, 2010-Ohio-3110, ¶ 99.

*State v. Gawron*, 7th Dist. Belmont No. 20 BE 0009, 2021-Ohio-3634, ¶ 43.

> "When other acts are 'inextricably intertwined' with [an] offense, those acts are said to be intrinsic to the alleged crime. In other words, acts that are 'inextricably intertwined' aid understanding by 'complet(ing) the story of the crime on trial.' *United States v. Siegel,* 536 F.3d 306, 316 (4th Cir. 2008). 'Evidence of other crimes is admissible when evidence of the other crime is so blended or connected with the crime on trial as the proof of one crime incidentally involves the other crime, *or explains the circumstances*, or tends logically to prove any element of the crime charged.' *State v. Long*, 64 Ohio App.3d 615, 617, 582 N.E.2d 626, * * * (9th Dist. 1989)."

(Emphasis sic.) *Stallworth* at ¶ 38. "Stated differently, * * * 'other acts' evidence

is inextricably intertwined with charged conduct when testimony about the other

acts is 'necessary to give the complete picture of what occurred.'" *State v. Sinclair*,

2d Dist. Greene No. 2002-CA-33, 2003-Ohio-3246, ¶ 35, quoting *State v.*

*Wilkinson*, 64 Ohio St.2d 308, 318, 415 N.E.2d 261 (1980).

Legal Analysis

**{¶58}** Grant argues that defense counsel should have objected to the admission of the recording of the 9-1-1 call that Franklin placed on the morning of his death and to the testimony from Davis regarding Franklin's injuries. To determine whether these events were inextricably intertwined with the crimes charged in this case, we will first examine the timeline established by the State at trial. The evidence indicates that Franklin called 9-1-1 at 7:27 A.M. on January 13, 2022 to report that Grant had assaulted him with a table leg. At 7:28 A.M., Grant called Wolf to borrow a gun. At 7:30 A.M., Davis observed Franklin at a gas station. Grant then drove to Hicksville; borrowed a gun from Wolf; returned to her home; and shot Franklin ten times. Chief Clemens then knocked on the door within minutes of the shooting, testifying that he arrived at the front door no later than 8:05 A.M. This entire sequence of events occurred in less than forty minutes.

**{¶59}** As Grant contacted Wolf within one minute of Franklin calling 9-1-1, her decision to obtain a handgun appears to be directly connected to what transpired between her and Franklin during their initial encounter that morning. Further, during the 9-1-1 call, Franklin stated that he believed that Grant had tried to kill him and indicated that Grant was the initial aggressor in the altercation that he was reporting. He also stated that, after Grant struck him with the table leg, he went upstairs and got his daughter's bat to defend himself. This provides critical background information that is necessary to understand why Franklin may have had

a bat in his hands when Grant later returned to the house with a handgun. The entire dynamic of the second encounter between Grant and Franklin on January 13, 2022 was shaped by what had transpired during their first encounter earlier that morning.

{¶60} Further, at the beginning of the 9-1-1 call, Franklin can be heard yelling at Grant to leave the house. At trial, Grant denied striking Franklin with a table leg and claimed that Franklin's head was not bleeding or apparently injured at the time of their initial encounter. Grant also stated that she did not know how Franklin sustained the head injuries that were discovered in his autopsy and suggested that he may have fallen down the stairs. However, roughly three minutes after Franklin called 9-1-1, Davis saw the head injuries that Franklin had described on the recorded call while he was at a local gas station. Other than Grant, Davis was the last known person to see Franklin alive.

{¶61} Finally, Chief Clemens came to Grant's house on the morning of January 13, 2022 because of the 9-1-1 call that Franklin had placed earlier that morning. Both Grant and Chief Clemens testified about their conversation that morning. Grant's trial testimony suggests that she was not aware that Franklin had placed a 9-1-1 call before Chief Clemens came to her house. Grant also explained that she was not forthcoming to Chief Clemens because she was afraid of being arrested. Thus, the content of the 9-1-1 call also forms the immediate background of the initial interaction that Grant had with Chief Clemens.

**{¶62}** Based on these observations, we conclude the acts that occurred during the first encounter between Grant and Franklin on the morning of January 13, 2022, as reported by Franklin in the 9-1-1 call and corroborated by Davis's testimony, clearly "form part of the immediate background of the alleged act which forms the basis for the crime charged." *Wainscott*, *supra*, at ¶ 19. As this information was "necessary to give the complete picture of what occurred," the evidence of these other acts "is inextricably intertwined with the charged conduct." *Sinclair, supra*, at ¶ 35, quoting *Wilkinson, supra*, at 318. Thus, we conclude this evidence was admissible. The failure to raise a meritless objection to admissible evidence does not constitute deficient performance. *State v. Brown*, 2020-Ohio-3614, 154 N.E.3d 1129, ¶ 79 (3d Dist.). Thus, Grant has not carried the burden of establishing an ineffective assistance of counsel claim. Her fifth assignment of error is overruled.

*Third Assignment of Error*

**{¶63}** Grant argues that the trial court committed plain error by failing to give the jury an instruction on self-defense.

Legal Standard

**{¶64}** "Jury instructions are critically important to assist juries in determining the interplay between the facts of the case before it and the applicable law." *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, 24 N.E.3d 1147, ¶ 5.

> 'Trial courts have a responsibility to give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the factfinder.' *State v. Shine-Johnson*, 10th Dist.

> Franklin No. 17AP-194, 2018-Ohio-3347, [117 N.E.3d 986,] ¶ 25.
> 'Requested jury instructions should ordinarily be given if they are
> correct statements of law, if they are applicable to the facts in the case,
> and if reasonable minds might reach the conclusion sought by the
> requested instruction.' *State v. Adams*, 144 Ohio St.3d 429, 2015-
> Ohio-3954, 45 N.E.3d 127[, ¶ 240]. Yet, a trial court may refuse to
> issue a requested jury instruction if 'the evidence adduced at trial is
> legally insufficient' to support it.' *State v. Juntunen*, 10th Dist.
> Franklin Nos. 09AP-1108 and Franklin Nos. 09AP-1109, 2010-Ohio-
> 5625, ¶ 13, quoting *State v. Barnd*, 85 Ohio App.3d 254, 259, 619
> N.E.2d 518 (3d Dist. 1993).

*State v. Cervantes*, 3d Dist. Henry No. 7-21-06, 2022-Ohio-2536, ¶ 35. "Thus, a

trial court need not provide a requested jury instruction unless it finds that sufficient

evidence was presented at trial to support giving the instruction." *State v. Stoychoff*,

3d Dist. Hancock Nos. 5-21-18, 5-21-19, 2021-Ohio-4248, ¶ 9.

{¶65} A "trial judge is in the best position to gauge the evidence before the

jury and is provided the discretion to determine whether the evidence adduced at

trial was sufficient to require an instruction." *State v. Fulmer*, 117 Ohio St.3d 319,

2008-Ohio-936, 883 N.E.2d 1052, ¶ 72. Thus, "[w]hen reviewing a trial court's

jury instructions, the proper review for an appellate court is whether the trial court's

refusal to give a requested jury instruction constituted an abuse of discretion under

the facts and circumstances of the case." *State v. Cobb*, 3d Dist. Allen No. 1-20-43,

2021-Ohio-3877, ¶ 53, *reversed on other grounds in State v. Cobb*, 169 Ohio St.3d

278, 2022-Ohio-3590, 203 N.E.3d 710, ¶ 1, quoting *State v. Dailey*, 3d Dist.

Hancock No. 5-99-56, 2000 WL 567894, *1 (May 9, 2000). An abuse of discretion

is not merely an error of judgment. *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d

86, ¶ 20 (3d Dist.).  Rather, an abuse of discretion is present where the trial court's decision was arbitrary, unreasonable, or capricious.  *Howton*, *supra*, at ¶ 23.

**{¶66}** "Crim.R. 30(A) governs requests for and objections to jury instructions in criminal cases * * *." *State v. Jamar*, 3d Dist. Van Wert No. 15-85-25, 1988 WL 87135, *3 (Aug. 19, 1988).  This provision reads, in its relevant part, as follows:

> On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection.  Opportunity shall be given to make the objection out of the hearing of the jury.

Crim.R. 30(A).  Thus, "[p]ursuant to Crim.R.30(A), failure to object to jury instructions, stating specifically the error and the grounds, waives all but plain error." *State v. Parker*, 7th Columbiana No. 04 CO 44, 2005-Ohio-6777, ¶ 18.  *See State v. Bridge*, 3d Dist. Allen No. 1-06-30, 2007-Ohio-1764, ¶ 20.  A formal objection is not necessary to preserve an issue with a jury instruction for appeal provided that

> (1) the record affirmatively shows the trial court has been fully apprised of the correct law governing a material issue in dispute; and (2) the requesting party has been unsuccessful in obtaining the inclusion of that law in the charge to the jury.

*State v. Spirnak*, 10th Dist. Franklin No. 19AP-261, 2020-Ohio-6838, ¶ 36, quoting *State v. Butler*, 10th Dist. Franklin No. 98AP-55, 1998 WL 733762, *3 (Oct. 22, 1998). *See State v. Wolons*, 44 Ohio St.3d 64, 67, 541 N.E.2d 443 (1989).

**{¶67}** Pursuant to Crim.R. 52(A), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B).

> For plain error to apply, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right. * * * Under the plain error standard, the appellant must demonstrate that there is a reasonable probability that, but for the trial court's error, the outcome of the proceeding would have been otherwise.

(Citations omitted). *State v. Bradshaw*, 2023-Ohio-1244, --- N.E.3d ---, ¶ 21 (3d Dist.). Plain error is recognized "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.,* quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Finally, "the *defendant* bears the burden of demonstrating that a plain error affected his substantial rights." (Emphasis sic.) *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 14.

**{¶68}** "Under R.C. 2901.05(A) and (B)(1), a defendant claiming self-defense has the burden of production—that is, the burden of producing evidence that 'tends to support' his use of force in defending himself." *State v. Estelle*, 2021-Ohio-2636, 176 N.E.3d 380, ¶ 18 (3d Dist.).

> If the defendant produces evidence that 'tends to support' that he used force in self-defense, '[t]he burden then shifts to the state under its burden of persuasion to prove beyond a reasonable doubt that the defendant did not use the force in self-defense.' [*State v.*] *Davidson-Dixon*, [2021-Ohio-1485, 170 N.E.3d 557,] ¶ 18 [(8th Dist.)].

Thus, "the burden of *proof* for the affirmative defense of self-defense has shifted to the state," but "the burden of production for * * * self-defense[] remains with the defendant." (Emphasis sic.) *State v. Messenger*, --- Ohio St.3d ---, 2022-Ohio-4562, --- N.E.3d ---, ¶ 22 (holding "a defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense").

> To determine whether a defendant satisfied his burden of production, the court must consider whether the evidence, from whatever source it may come, 'tends to support' the defendant's claim of self-defense. * * * Evidence 'tends to support' the defendant's use of force in self-defense if it "'serve[s], contribute[s], or conduce[s] in some degree or way' to support that he used the force in self-defense * * *." [*State v.*] *Petway*, [2020-Ohio-3848, 156 N.E.3d 467,] ¶ 74 [(11th Dist.)], quoting TEND, *Black's Law Dictionary* (11th Ed.2019) * * *. Stated differently, "evidence 'tends to support' that a defendant used force in self-defense, and a defendant is entitled to a jury instruction on the defense of self-defense under R.C. 2901.05 * * *, where the evidence in the record is sufficient to raise a question of reasonable doubt of guilt, based on a claim of self-defense, in the mind of a reasonable juror." *State v. Jacinto*, 8th Dist., 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 49.

*Estelle* at ¶ 18. "The reference in R.C. 2901.05(B)(1) to 'evidence presented that tends to support' self-defense indicates that the defendant's burden of production is not a heavy one and that it might even be satisfied through the state's own evidence." *Messenger* at ¶ 22, quoting R.C. 2901.05(B)(1). Thus,

> a defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense. Similarly to the standard for judging the sufficiency of the state's evidence, if the defendant's evidence and any reasonable inferences about that evidence would allow a rational

trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden.

*Messenger* at ¶ 25. "To be justified, a jury instruction must be based on an actual issue in the case as demonstrated by the evidence." *State v. Cunningham*, 2d Dist. Montgomery No. 29122, 2023-Ohio-157, ¶ 13.

'In deciding whether to give a self-defense instruction, the trial court must view the evidence in favor of the defendant, and the question of credibility is not to be considered.' *Davidson-Dixon* at ¶ 20. Even so, '[i]f the evidence generates only a mere speculation or possible doubt, such evidence is insufficient to raise the * * * defense, and submission of the issue to the jury will be unwarranted.' [*State v.*] *Tolle*, [4th Dist. Adams No. 19CA1095, 2020-Ohio-935] ¶ 23, quoting [*State v.*] *Melchior*, [56 Ohio St.2d 15,] 20, [381 N.E.2d 195 (1978)].

(Citations omitted.) *Estelle* at ¶ 19.

A defendant's bare assertion that he acted in self-defense will be insufficient. Rather, the assertions must be coupled with supporting evidence from whatever source and of a nature and quality sufficient to raise reasonable doubt as to guilt.

*State v. Palmer*, 12th Dist. Clermont No. CA2021-07-035, 2022-Ohio-2181, ¶ 18. "If the evidence adduced at trial is legally insufficient to raise the issue of self-defense, the court is not obligated to instruct the jury regarding this claim and has discretion to completely remove it from the jury's consideration." *State v. Barnd*, 85 Ohio App.3d 254, 259, 619 N.E.2d 518, 521 (3d Dist. 1993).

{¶69} "The elements of self-defense differ depending on whether the defendant used deadly or non-deadly force to defend himself." *State v. Eddy*, 3d Dist. Allen No. 1-22-17, 2022-Ohio-3965, ¶ 14, quoting *State v. Bagley*, 3d Dist.

Allen No. 1-13-31, 2014-Ohio-1787, ¶ 15. "The use of a gun constitutes the use of deadly force." *State v. Dale*, 2d Dist. Montgomery No. 2012 CA 20, 2013-Ohio-2229, ¶ 15.

> To establish self-defense through the use of deadly force, an accused must prove: '(1) the accused was not at fault in creating the situation giving rise to the affray; (2) the accused had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that the only means of escape from such danger was in the use of force; and (3) the accused must not have violated any duty to retreat or to avoid the danger.'

*State v. Chavez*, 3d Dist. Seneca Nos. 13-19-05, 13-19-06, and 13-19-07, 2020-Ohio-426, ¶ 39, quoting *State v. Thacker*, 3d Dist. Marion No. 9-03-37, 2004-Ohio-1047, ¶ 14. *See Messenger* at ¶ 14.

{¶70} As to the first element, "[i]t is well established that a person cannot provoke a fight or voluntarily enter combat and then claim self-defense." *State v. Canankamp*, 3d Dist. Auglaize No. 2-22-02, 2023-Ohio-43, ¶ 38, quoting *State v. James*, 2d Dist. Montgomery No. 28892, 2021-Ohio-1112, ¶ 21. "The second element of a self-defense claim is a combined subjective and objective test." *State v. Hunt*, 8th Dist. Cuyahoga No. 111892, 2023-Ohio-1977, ¶ 26, citing *State v. Thomas*, 77 Ohio St.3d 323, 330, 1997-Ohio-269, 673 N.E.2d 1339, 1345 (1997). Thus, "self-defense 'is placed on the grounds of the bona fides of defendant's belief, and reasonableness therefor, and whether, under the circumstances, he exercised a careful and proper use of his own faculties.'" *Thomas* at 1345, quoting *State v. Sheets*, 115 Ohio St. 308, 310, 152 N.E. 664 (1926).

**{¶71}** "Part of this entails showing that the defendant used 'only that force that is reasonably necessary to repel the attack." *State v. Ray*, 12th Dist. Butler No. CA2012-10-213, 2013-Ohio-3671, ¶ 30, quoting *State v. Bundy*, 2012-Ohio-3934, 974 N.E.2d 139, ¶ 55 (4th Dist.). This "requires consideration of the force that was used in relation to the danger the accused believed he was in. * * * In both deadly and non-deadly force cases, '[i]f the force used was so disproportionate that it shows a purpose to injure, self-defense is unavailable.'" *State v. Lane*, 6th Dist. Erie No. E-22-035, 2023-Ohio-1305, ¶ 24, quoting *State v. Barker,* 2022-Ohio-3756, 199 N.E.3d 626, ¶ 27 (2d Dist.). Finally, as to the third element, "[a] person has no duty to retreat before using force in self-defense * * * if that person is in a place in which the person lawfully has a right to be." R.C. 2901.09(B).

Legal Analysis

**{¶72}** In her brief, Grant concedes that the standard for plain error governs this assignment of error because defense counsel did not object to the trial court's decision not to instruct the jury on self-defense. Appellant's Brief, 21. *See also City of Dayton v. Myers*, 2d Dist. Montgomery No. C.A. 16699, 1998 WL 425498, *5 (July 24, 1998); *State v. Stewart*, 10th Dist. Franklin No. 12AP-527, 2013-Ohio-1463, ¶ 9. Thus, we begin by examining whether there was a reasonable probability that the outcome of this proceeding would have been different had the trial court given a jury instruction on self-defense.

{¶73} The evidence produced at trial indicates that Grant entered her house on the morning of January 13, 2022 and encountered Franklin. The State introduced a recording of a 9-1-1 call that Franklin placed at 7:27 A.M. in which he described this encounter. Franklin reported that his "wife just tried to kill" him. (Ex. 1). He stated that he "was laying on a chair" and that Grant struck his head "[a]t least" two times with "[a] table leg" before he "could get up." (Ex. 1). He also stated that he "ran upstairs," got his daughter's baseball bat, and told Grant to leave. (Ex. 1). Franklin said that Grant then left in her car.

{¶74} Davis testified that Franklin had come to the gas station where she worked at roughly 7:30 A.M. with fresh wounds on his head. She stated that his eyes were almost swollen shut and that blood was dripping from his head. Further, the autopsy revealed that Franklin had sustained several head wounds as the result of blunt force trauma. The deputy coroner testified that Franklin sustained these injuries to his head while he was alive and that these injuries were not related to Franklin's gunshot wounds. The deputy coroner also stated that Franklin's hand had sustained an injury that could possibly have been a defensive wound or could have come from hitting something. Thus, the State presented some evidence that Grant was the initial aggressor in an altercation that occurred during her first encounter with Franklin on January 13, 2022.

{¶75} At trial, Grant denied assaulting Franklin that morning. She testified that he did not recognize her when she entered the house and that he responded to

her as though she was an intruder, swinging a bat at her before she left the premises. But Grant testified that, during this early encounter with Franklin, she did not observe any injuries to his head or any bleeding. She stated that she had "absolutely no idea" how he had sustained these head injuries in between the time she left at roughly 7:27 A.M. and the time Franklin arrived at the gas station at roughly 7:30 A.M. (Tr. 400). At trial, Grant did not provide an explanation for Franklin's injuries and the 9-1-1 call other than suggesting that he "maybe fell down the stairs" or was "hallucinating." (Tr. 416).

{¶76} The State also produced evidence that Grant sought a firearm from a friend after she had left her house and then returned for her second encounter with Franklin armed with a handgun. The evidence at trial indicates that, within one minute of Franklin calling 9-1-1, Grant was placing a call to Wolf, asking to borrow a gun. Wolf testified that Grant stated that she wanted the gun to take a concealed carry class and that he agreed to meet her in Hicksville for the purpose of giving her a gun. During her testimony, Grant did not dispute these facts. She testified that Wolf showed her how to engage the safety and affirmed that, once she received the gun, she "immediately returned" to her house. (Tr. 418).

{¶77} Grant testified that, when she returned to her neighborhood, she circled past her house and observed a silhouette in the bathroom window. For this reason, she believed that Franklin was in the house at that time. Grant stated that she decided to enter the house because she wanted to obtain several items before

she left. She also stated that she planned "to put the gun away where nobody would see it or find it" after she entered the house and that she "didn't want to have it on * * * [her]" because she did not "like guns." (Tr. 394).

{¶78} Grant stated that, when she entered the house, Franklin was standing by the stairs with the baseball bat in his hands that he had, based on the 9-1-1 call, grabbed at the end of their first encounter that morning. She testified that Franklin came towards her and that he began to swing the bat. Grant stated that the "gun was caught in her pocket and the trigger * * * went off." (Tr. 421). She said, "I shouldn't have had my finger on the trigger, but it went off." (Tr. 396). Grant reported to the police that she "thought the safety was on" and that she "accidentally fired it at him * * *." (Ex. 3).

{¶79} Because Grant asserted that she "accidentally" fired the gun at Franklin, her own statements about these initial shots at least partially undermine her arguments about self-defense on appeal. (Ex. 3). "A defendant claiming self-defense 'concedes that he [or she] had the purpose to commit the act, but asserts that he [or she] was justified in his actions.'" (Brackets sic.) *State v. Davis*, 8th Dist. Cuyahoga No. 109890, 2021-Ohio-2311, ¶ 38, quoting *State v. Talley*, 8th Dist. Cuyahoga No. 87413, 2006-Ohio-5322, ¶ 45. *See also State v. Wilson*, 2d Dist. Clark No. 2021-CA-68, 2022-Ohio-3763, ¶ 65. However, she also testified that she believed that, if she had not fired the gun, Franklin would have struck her with the bat and that she did not shoot down into the floor for the same reason.

{¶80} Grant then testified that Franklin "swung at least two more times * * *" and that she continued to fire the gun until he dropped to the ground. (Tr. 396). She stated that, as this was happening, Franklin exclaimed, "What the f**k, you're killing me." (Tr. 439). The deputy coroner testified that the autopsy revealed that Franklin suffered ten gunshot wounds and that six bullets were recovered from his body. Grant stated that she was "shocked" when she discovered that Franklin had a total of ten gunshot wounds. (Tr. 429). The deputy coroner also discovered that Franklin had an abrasion on his forearm from gunpowder, indicating that Grant fired the gun in close proximity to his body.

{¶81} Grant's testimony provided an explanation for this abrasion. She indicated that, after Franklin had dropped to the ground, he was still alive. At trial, Grant affirmed that she had no medical training that could assist her in determining Franklin's chances of survival and that she did not "call the police department or the EMS to get him some help[.]" (Tr. 432). She testified that she went over to him, "s[aw] the pain in his face," and fired the final, tenth shot into his body to "end his suffering." (Tr. 397). Grant testified that she believed that he was already dying and that she fired this tenth shot "[t]o save him one more second of pain * * *." (Tr. 432). At trial, she affirmed that this "last shot was to end his life" and that she "shot him so that he would die[.]" (Tr. 432).

{¶82} Grant testified that, in "less than five minutes" after she shot Franklin, Chief Clemens came to her door to take a report from Franklin based upon his earlier

9-1-1 call. Instead of reporting that Franklin was dead, Grant told Chief Clemens that there was no domestic violence; that Franklin was drunk; that he was passed out; and that she did not want to wake him up or disturb him. On cross-examination, she was asked why she did not explain to Chief Clemens what had happened. She replied, "And that was typically what I would have done or what anybody would have done." (Tr. 432). However, she explained that she did not tell Chief Clemens what had transpired because she was "freaked out" and because she was afraid of being arrested. (Tr. 433).

**{¶83}** Grant then testified that she wrapped Franklin up in plastic and dragged his body into the basement where she spent the next couple of days constructing a concrete vault around his remains with supplies she had purchased from Menards. She also testified that she cut out the carpet in her living room and disposed of it in the dumpster where she worked. At trial, Grant admitted that, on January 21, 2022, she did not reveal that Franklin had died when Officer Esparza came to her house after one of Franklin's relatives had filed a missing person report. She admitted that she did not tell the truth to Officer Esparza. She further admitted that she was not immediately forthcoming during the police interview with Chief Clemens on January 22, 2022 and continued to tell a story about how Franklin was missing for a significant portion of that interaction.

**{¶84}** Given this evidence, we cannot conclude a reasonable probability exists that the inclusion of an instruction for self-defense would have changed the

outcome of this proceeding. Grant has not, with her arguments on appeal, carried the burden of establishing plain error. However, even if the standard for plain error were not applicable, we would still conclude that the trial court did not abuse its discretion in deciding not to instruct the jury on self-defense because Grant's own trial testimony undercut the possibility of finding she acted in self-defense.

{¶85} To explain this conclusion, we return to Grant's testimony about the tenth shot that she fired at Franklin. On direct examination, she was questioned about this tenth shot, and the following exchange occurred:

[Defense Counsel]: And you kept shooting?

[Grant]: Until he fell down.

[Defense Counsel]: And you kept shooting after he fell down.

[Grant]: He fell down and I—I was in so much shock by that moment, and all I remember is—if you've ever seen somebody taking their last breath, and you know that kind of labored breathing.

[Defense Counsel]: So he was laying on the ground when you observed that to happen, so you knew he was dying?

[Grant]: I didn't want him to hurt.

[Defense Counsel]: Is that what you meant when you told the police that you put him out of his suffering?

[Grant]: I knew he was already gone, but you could see the pain in his face. It was heartbreaking.

(Tr. 397). On cross-examination, the following exchange then occurred:

> [Prosecutor:] So it is fair to say with that knowledge that you knew that he was suffering and that you knew that he was dying that last shot was to end his life; correct?
>
> [Grant:] To save him one more second of pain, yes.
>
> [Prosecutor:] You shot him so that he would die?
>
> [Grant:] Because I knew he was already going to.
>
> [Prosecutor:] So, yes?
>
> [Grant:] Yes.

(Tr. 432). Grant's own trial testimony establishes that she fired the tenth shot into Franklin's body to end his life after he was lying on the ground and incapable of harming her in any way.

{¶86} Courts have held that a self-defense claim is undermined where the evidence demonstrates that a defendant shot a person after he or she had been incapacitated or was lying on the ground because this indicates the shooting occurred when the person was no longer posing an imminent threat. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 259 (finding defense counsel may reasonably have decided not to request a self-defense instruction where defendant shot the victim "four times, twice as he lay on the ground * * *"); *State v. Palmer*, 80 Ohio St.3d 543, 569-570, 1997-Ohio-312, 687 N.E.2d 685 (1997); *State v. Shakoor*, 7th Dist. Mahoning No. 02AP-577, 2003-Ohio-5140, ¶ 114 ("firing multiple shots into a victim after the victim is clearly incapacitated is inconsistent with self-defense"); *State v. Brown*, 10th Dist. Franklin

No. 30AP-858, 2004-Ohio-5064, ¶ 32 (finding self-defense was not applicable where defendant fired two non-lethal shots at the victim and then, after the passage of five to seven seconds, fired a third lethal shot at close range to the victim). *See State v. Adkins*, 2020-Ohio-1618, 153 N.E.3d 970, ¶ 76 (8th Dist.). *See also State v. Reyes-Figueroa*, 2020-Ohio-4460, 158 N.E.3d 939, ¶ 45 (8th Dist.) (holding that "a pause between gunshots" was "sufficient to conclude that appellant knowingly and purposely intended to finish the course of action, i.e. kill [the victim]"); *State v. Roland*, 10th Franklin No. 16AP-484, 2017-Ohio-557, ¶ 21 ("Firing multiple shots undermines a claim of self-defense.").

**{¶87}** Grant's trial testimony clearly establishes that she did not fire the shot that ended Franklin's life in self-defense. *See also State v. Lancaster*, 106 Ohio App. 401, 407, 155 N.E.2d 215 (9th Dist. 1957). Her testimony indicates that there was a pause in between the first nine shots that she had fired at Franklin and the tenth shot. She testified that Franklin was lying on the ground and that his breathing was labored at this point. Grant then affirmed that she fired the tenth shot at Franklin with the intention of causing his death. Grant's own testimony does not provide some evidence that tends to show that she "had a bona fide belief that * * * she was in imminent danger of death or great bodily harm and that the only means of escape from such danger was in the use of force." *Chavez, supra*, at ¶ 39, quoting *Thacker, supra*, at ¶ 14.

{¶88} Having examined the evidence in the record, we conclude that Grant did not produce evidence that could raise the affirmative defense of self-defense but instead produced evidence that clearly establishes that she did not act in self-defense in firing the shot that ended Franklin's life. Thus, she failed to carry the burden of production in establishing this affirmative defense. Accordingly, we cannot conclude that the trial court abused its discretion in declining to include a jury instruction on self-defense.

{¶89} Further, under the first assignment of error, Grant asserted that the statements she gave during the police interview on January 22, 2022 were prejudicial because these statements "directly undermined [her] * * * claim of self-defense in the minds of the jury and led to her conviction for Murder." Appellant's Brief, 13. In these statements to law enforcement, Grant admitted to firing the final shot into Franklin as he was lying on the ground. Thus, we agree with Grant's assertion that the statements she gave to law enforcement "directly undermined [her] * * * claim of self-defense." *Id.*

{¶90} In conclusion, Grant has not carried the burden of establishing that the trial court's decision not to instruct the jury on self-defense amounted to plain error. Further, even if the standard for plain error did not apply, the trial court did not abuse its discretion in deciding not to instruct the jury on self-defense as Grant failed to carry the burden of production in raising this affirmative defense. Instead, her

own trial testimony and statements to the police established that she did not act in self-defense. For these reasons, her third assignment of error is overruled.

*Second Assignment of Error*

**{¶91}** Grant asserts that her convictions for murder and the associated firearm specification were against the manifest weight of the evidence, arguing that the evidence at trial established that she acted in self-defense.

Legal Standard

**{¶92}** In examining self-defense arguments on appeal, "the sufficiency-of-the-evidence standard of review applies to * * * [a defendant's] burden of production and a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *Messenger*, *supra*, at ¶ 26. "[A]n appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict." *State v. Plott*, 2017-Ohio-38, 80 N.E.3d 1108, ¶ 73 (3d Dist.). Thus, "the appellate court sits as a 'thirteenth juror' * * *." *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 17, quoting *State v. Thompkins*, 78 Ohio St.3d, 386, 387, 1997-Ohio-52, 678 N.E.2d 541, 546 (1997). On appeal, courts

> must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' *State v. Brentlinger*, 2017-Ohio-2588, 90 N.E.3d 200, ¶ 36 (3d Dist.), quoting *Thompkins* at 387 * * *.

*State v. Slone*, 3d Dist. Van Wert No. 15-22-4, 2023-Ohio-1110, ¶ 9, quoting *State v. Schatzinger*, 3d Dist. Wyandot No. 16-20-04, 2021-Ohio-167, ¶ 52.

**{¶93}** "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *Sullivan*, *supra*, at ¶ 38, quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

Legal Analysis

**{¶94}** Under the previous assignment of error, we concluded that the trial court did not err in deciding not to give a jury instruction on self-defense because Grant did not produce evidence from which the jury could conclude that she had acted in self-defense. Since Grant did not carry the burden of production, she failed to raise the affirmative defense of self-defense in this case. Accordingly, Grant's arguments that the State failed to carry the burden of persuasion on the issue of self-defense are without merit. *See also State v. Harris*, 2017-Ohio-2751, 90 N.E.3d 342, ¶ 56 (8th Dist.). Her second assignment of error is overruled.

*Fourth Assignment of Error*

**{¶95}** Grant argues that her counsel was ineffective for failing to object to the trial court's decision to deny a requested jury instruction for self-defense.

Legal Standard

**{¶96}** We herein reincorporate the legal standard for ineffective assistance of counsel claims as set forth under the fifth assignment of error.

Legal Analysis

**{¶97}** In this assignment of error, Grant argues that defense counsel was ineffective for failing to object to the trial court's decision to deny a request for a self-defense instruction. However, under the third assignment of error, we have already concluded that Grant failed to carry the burden of producing evidence that was sufficient to raise the affirmative defense of self-defense. Thus, we cannot conclude that defense counsel's performance was deficient for failing to raise a meritless objection to the jury instructions. *See State v. Kenney*, 5th Dist. Holmes No. CA93-480A, 2000 WL 699673, *18 (May 10, 2000).

**{¶98}** Further, we also note that the arguments between the State and the Defense over the jury instructions were primarily over the inclusion of an instruction for voluntary manslaughter. As a general matter, arguments based upon self-defense are inconsistent with arguments based upon voluntary manslaughter. *State v. Caldwell*, 10th Dist. Franklin No. 98AP-165, 1998 WL 890232, *7 (Dec. 17, 1998). This is because "[s]elf-defense * * * requires a showing of fear, whereas

voluntary manslaughter requires rage." *State v. Rizer*, 4th Dist. Meigs No. 10CA3, 2011-Ohio-5702, ¶ 37, quoting *State v. Thompson*, 10th Dist. Franklin No. 92AP1124, 1993 WL 51114, *2 (Feb. 23 1993). "For that reason, self-defense and * * * voluntary-manslaughter instructions are incompatible in most cases." *State v. Dixon*, 2d Dist. Greene No. 2021-CA-29, 2022-Ohio-3157, ¶ 22.

{¶99} In this case, defense counsel focused his arguments on securing a voluntary manslaughter instruction. Such a strategy was in accord with the facts of this case. Further, defense counsel's arguments were ultimately successful in securing an instruction on voluntary manslaughter. On appeal, Grant appears to be arguing that defense counsel should have focused more on securing a self-defense instruction than on a voluntary manslaughter instruction. However, such a decision falls squarely within the realm of debatable tactics and trial strategy. *State v. Diestler*, 9th Dist. Lorain No. 17CA011106, 2018-Ohio-5263, ¶ 14 (considering defense counsel's decision to pursue a trial strategy oriented around voluntary manslaughter rather than self-defense to be a debatable trial tactic). We cannot conclude that the failure to object to the jury instructions constituted deficient performance in this case. *See State v. Wiley*, 10th Dist. Franklin No. 03AP-340, 2004-Ohio-1008, ¶ 26.

{¶100} Finally, "[t]he prejudice standards for plain-error and ineffective-assistance-of-counsel claims are the same * * *." *State v. Morrissey*, 2022-Ohio-3519, 198 N.E.3d 554, ¶ 29 (3d Dist.), quoting *Cervantes*, *supra*, at ¶ 58. *See State*

*v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22 (holding that, to establish plain error, "[t]he accused is * * * required to demonstrate a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims"). Under the third assignment of error, we concluded that the trial court's decision to deny defense counsel's request for a jury instruction on self-defense did not constitute plain error. Since Grant has failed to demonstrate prejudice under the plain error standard, she cannot carry the burden of establishing the prejudice prong of an ineffective assistance of counsel claim. For these reasons, her fourth assignment of error is overruled.

*Sixth Assignment of Error*

{¶101} Grant argues that the cumulative effect of the ineffective assistance of counsel claims that she has raised in this appeal was to deny her a fair trial.

Legal Standard

{¶102} "Under the cumulative-error doctrine, 'a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal.'" *State v. Troche*, 3d Dist. Marion No. 9-22-18, 2023-Ohio-565, ¶ 53, quoting *State v. Spencer*, 3d Dist. Marion No. 9-13-50, 2015-Ohio-52, ¶ 83. "To find cumulative error, a court must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below

would have been different but for the combination of the harmless errors." *In re J.M.*, 3d Dist. Putnam No. 12-11-06, 2012-Ohio-1467, ¶ 36.

**{¶103}** An appellant may argue that the cumulative error doctrine is applicable on the basis of multiple ineffective assistance of counsel claims that have been raised on appeal. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 296. However,

> [e]ach assertion of ineffective assistance of counsel going to cumulative error depends on the merits of each individual claim; when none of the individual claims of ineffective assistance of counsel have merit, cumulative error cannot be established simply by joining those meritless claims together.

*Gear, supra*, at ¶ 59, quoting *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 170.

Legal Analysis

**{¶104}** Grant raised ineffective assistance of counsel claims in her fourth and fifth assignments of error. After considering the merits of these claims, we concluded that these arguments were without merit. In the absence of demonstrating error, Grant cannot demonstrate cumulative error. Since she has failed to identify multiple instances in which her trial counsel was ineffective, she has failed to establish that the cumulative error doctrine is applicable herein. *State v. Lewis*, 3d Dist. Van Wert No. 15-20-04, 2020-Ohio-6894, ¶ 91. Accordingly, her sixth assignment of error is overruled.

*Conclusion*

**{¶105}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Paulding County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**WALDICK and ZIMMERMAN, J.J., concur.**

**/hls**